Good afternoon. Illinois Appellate Court First District Court is now in session. The Sixth Division, the Honorable Justice Carl A. Walker presiding. Case number 24-2140, The Peoples Gas Light and Coke Company v. Illinois Commerce Comm'n and the People of the State of Illinois. Good afternoon everyone. I am Justice Carl Walker and I have here with me today Justice Michael B. Hyman and Justice Celia Gammareth. We will grant each side 20 minutes to argue and I'm going to now ask you to introduce yourselves and I'm going to ask the appellant to let me know how much time that will be saved for rebuttal and you can save as much time as you want of that 20 minutes. And then for the appellees, I want you to decide how you're going to split your time. You'll have a total of 20 minutes and I'll let you decide that and you can decide that if you need to have a discussion in our presence, that's fine. If you need to have a private discussion, that's fine with us too. Just let us know that you want to do that and we'll allow you to call each other on the phone and take a minute and resolve that. We try hard to be fair and make this easy. So let's start though with the appellant. Thank you, Your Honor. Elizabeth Roccozzi on behalf of the People's Gaslight and Coke Company. I will use 15 minutes for direct and then I will reserve five minutes for rebuttal. Please. Okay, thank you Ms. Roccozzi. Good afternoon. I can go first. Brian Dodds for the Illinois Commerce Commission. I'm proposing equal division in the event the court wanted 20 minutes per side. Ms. Gottlieb? Good afternoon. Anna Gottlieb for the people of the state of Illinois and as Mr. Dodds said, we'll happily split the time evenly. Okay, that'll work. It's 10 minutes each. Okay, so we're going to ask Ms. Roccozzi if you want to get us started. Go right ahead. Thank you, Your Honor. May it please the court. We are here today because the Illinois Commerce Commission has single-handedly rewritten the centrally old prudent standard, drastically raising the bar for Illinois utilities to recover their reasonable costs. Back in 2016, People's Gas invested hundreds of millions of dollars. Isn't it your core argument has to do with the commission, you say, shifting the burden? Is that right? I'm not trying to put words in your mouth, but the statute says it's clear that the burden's on the utility to prove actual prudent and reasonable costs. So the burden's on you. So my question is, how do you distinguish that they are just disagreeing with you as opposed to shifting the burden? Thank you, Your Honor. So we would agree that the burden is on the utility and the burden remains on the utility. And People's Gas satisfied the burden and made its prima facie case of prudence and that under the statute. But that's your opinion. You said that's a conclusion, okay? And the commission takes the evidence, weighs it, and makes a decision. So why is that just disagreeing? Our position, Your Honor, is that the commission did not properly engage in the burden shifting analysis under Illinois law. But this argument has been made in two recent cases, correct, where the utilities both lost. Two appellate decisions, NICOR and Commonwealth Edison. In both cases, the same argument was raised and turned down. Is there any difference here? I believe there is, Your Honor, because our position is that to show imprudence, you must not only be wrong, but you must be beyond the realm of reasoned disagreement. And in the case below, the commission took, at times, hypotheticals, unproven alternatives to satisfy the intervener's burden of production. But that does not satisfy showing that the company's decisions were imprudent. And under that standard, you would need to show that their decisions were not prudent at all. Is there any precedent that you have that you can cite to for your proposition? So, yes, Your Honor. Commonwealth Edison Company, that was a decision by the commission. It's a 2016 case. I can give you the docket number if you would like. I'm not talking about commission decisions, but any appellate decisions that your position has been upheld in situations like this. Your Honor, can you... We have two recent decisions that go the other way, and they're very strongly worded. And I'm just wondering how, you know, reading those decisions and looking at this record, it's quite voluminous, and reading the briefs, which were well-written, again, how do you overcome the hurdle where we have two recent cases going the other way? So I would distinguish those cases, Your Honor, because those are general rate cases. The case under review was pursuant to a specific legislative statute that set forth what was required to make a prima facie case of prudence, and the company satisfied that standard, and that is different than a section 9-201 general rate case. The legislator carved out in a specific exception for the types of investments that the company made in the case below, excuse me, that were reviewed in the case below. And I believe your court also understood at one point, or heard the commission's interpretation of its authority in a 2019 case, and although that has no precedential value, given it as a Rule 23b case, but there the commission made clear that it was limited in its discretion to just to otherwise judge the reasonableness of costs of a utility because the legislature had given it... They're not contesting that they know what the rule, the statute says, they're saying they followed the statute, exactly. I mean, it just seems that you have a disagreement on how the evidence comes out. I believe our position, Your Honor, is not, is that they departed from their past interpretation of that, of the section 9-220.3, and in prior cases that had used that statute as a reason why it actually was found by the justness and the reasonableness of the cost, and it was... To be clear, though, let me interrupt. Your position is you filed a petition, you have supporting affidavits, testimony, documentation, and you feel that that satisfied your burden. Well, that made up for... But then there's counter-evidence, and staff and AG Cub come in and they say, no, this is where there should be disallowances, and then the commission weighs it. So we're trying to understand how is this impermissible burden shifting? Isn't it the commission's job to weigh the testimony, weigh the evidence, and then determine did you meet the prudence standard or not? The commission is replete with, you know, commentary about no hindsight review, prudence is reasonable, they considered your arguments, the same ones that you're making here, and rejected it and said this is the standard. They're also not bound by past interpretations of their decisions. So now here we are, as Justice Hyman said, you presented a lot, but so did the other side. And you got virtually all of what you wanted, you were 8% short, but when you make the argument of the commission has to basically understand and give us what we want, that's not the role either. We have the hub, we have the commission, they have to balance your company's rights along with the rights of consumers, so it is not just give us what you think is prudent and we will rubber stamp it. And maybe that's how it was in the past, but that's not how it is currently, nor should it be. So tell us about how there is a legal error versus just you disagreeing with their weighing of the evidence. Thank you, Your Honor. I think one of the main questions before this court is what is required to undo a prima facie showing? Once the company made its statutory, or excuse me, satisfied its statutory burden by coming forward with the evidence required by the Assembly, and then staff intervenors, other parties, then came forward with evidence, again, not disproving that the company made its case, but by suggesting alternatives, other options, and we don't even refute that, that you can come forward with another reasonable option. But again, in prudence, under well-established law requires that the company's actions were not prudent at all. There can be reason to disagreement when you are establishing prudence, but that does not rise to the level of imprudence. And we would say that they... But help us out a little bit, Ms. Wieckowski. Pardon me? Go ahead, Justice Gamble. So I heard you use the word at all twice, saying not prudent at all. I don't see that in the case. I don't see those two words at all. But when the case law says it's not enough to be wrong, but be beyond the realm of reasoned disagreement, that means effectively that you cannot be prudent at all, because if it was within the realm of reasoned disagreement, it means that there can be a difference of opinion, a reasonable difference of opinion. And we concede to that. But to prove that the company's choices were imprudent, particularly under a statute that encouraged gas utilities to make critical infrastructure safety investments, is showing that the intervenors in the case alone made did not rise to the level of the company's actions being imprudent. And so, Ms. Wieckowski, I actually understand your imprudent argument. But what I want you to do is identify what evidence the commission relied on that you claim to have been unreasonable or insufficient. I think the easiest example to point to is the commission's program and construction management disallowance. And that was an $8 million disallowance, and it was the largest disallowance at issue in the case. And to show hindsight, as indicated, I don't know if I've said this yet, but prudence is judged by information known at the time a utility's decision was made, not on later developments. So here, information known to the utility. Yes, we're aware of that. Okay, thank you. So the easiest way I think to spot a hindsight problem is when you can't make a critique without resorting to more recent performance. And that is what the ICC did in the case below. It used the company's performance, and it compared it to the company's performance in 2017 and 2018. In other words, it looked backward, and it faulted the company for not having a more mature program management function established sooner. And staff, the proponent of the larger disallowance, $7.2 million disallowance, the larger disallowance, on the record, numerous times in the commission conceded that staff did not examine any imprudent costs or any imprudent actions done by the company to support the fact that somehow the program, sorry, that somehow the company's management was imprudent. The only thing that it established in the record was that the costs in 2016 were higher than those in 2017 and 2018. And to take it one step back, I think it's important to remember that these are reconciliations, and so they are backwards looking. But you can only use information known to the utility at the time its decisions were made. And the problem here is that the actual reconciliation did not occur until years later, almost eight years later. So inevitably- Did you, your systems track 2016 management costs precisely? They were certainly tracked in certain regards- It wasn't precise, and that's part of the problem. So it has to do with what information did the ICC have? And so, you know, did they have to accept carte blanche, what you're saying, or in light of the insufficiency of the evidence, had to do something else in order to fill in the blanks? Well, our position is that there's no exception to the hindsight rule, whether or not the ICC agreed or disagreed with our accounting systems at the time. That's not hindsight, that's trying to put a, sometimes you have to look at the context, okay? And you're saying, what you're basically saying is, oh, they're stuck, right? Catch 22, we didn't do our job, so you're stuck, and you have to accept what we did. They don't have to do that. I don't believe why they'd have to do that when they try to come up with an alternative to fill in the blanks. Well, we would disagree with the commission's position that it only used later data, or, excuse me, later performance to calculate a disallowance, because again, it doesn't really pass the smell test. ICC acknowledges that staff didn't examine any specific projects, or any specific management action or inaction that they said was imprudent. The EG actually did do that exercise and only came up with $2.4 million. But staff, again, did not do that type of exercise. The only supporting evidence in the record is that costs were higher in later years, and referencing those later years by definition under the prudent standard, as it has been interpreted by the appellate court, does not allow the commission to use subsequent outcomes or later developments. It must put itself in the shoes of management at the time its decisions were made, and so the 17 and 18 costs were not known at that time. So those costs in later years can't be used to make a finding of improvements. We actually agree with you, but what I want, and I'm going to jump ahead a little bit. So tell us what specific, as you know, we're kind of bound by the commission's factual conclusions. What factual conclusions did the commission make that you can now argue are directly contradicted by the record? Because we can look to the record, and if the record contradicts those factual conclusions, then we're not bound by anything. So help us there. Sorry, can you restate that last part? Sure. The last part is that we are bound by their factual conclusions, but if those factual conclusions are directly contradicted by the record, then we are not bound by those factual conclusions. So I'm asking you to help us out here, kind of walk us through this a little bit. Let us know what specific factual conclusions of the commission are directly contradicted by the record. Help us with that. So I think the most blatant example would be that the company only chose the cheapest contractors, they imposed on the company a standard to only pick the cheapest contractor every single time, and then said that the company never explained for the few instances that it didn't why it made choice. So essentially, the commission then adopted a lease cost standard that's not present in the statute, said that People's Gas didn't abide by it, and then adopted a disallowance. I thought the issue was that they believe People's Gas went with the highest bids. No, Your Honor, that we didn't go with the cheapest bid. We were penalized because we didn't go with the cheapest contractor. That's what I'm saying. We're saying the same thing. We're saying the same thing. They're arguing that People's Gas went with the higher bids. Oh, yes, Your Honor. So we're saying the same thing. Yes, we are. So in that regard, in making that finding, it also concluded that we didn't put forth any substantial evidence showing in those instances why we did not choose the cheapest contractor. And that is against the record evidence because we know... Yeah, because the cheapest is not always the best. Of course not. And that's why the legislature and the courts, as they have interpreted the prudence standard, don't require there to be a lease cost mandate to show prudence. And I guess also another item that has come to me... Well, I mean, that's a conclusion you're drawing at the lease cost inference, but that doesn't seem to be what the decision of the ICC said. I mean, would Justice Walker's question walk us through this where there's something that contradicts? And I haven't heard anything that contradicts. I believe the commission itself admitted that under the prudence standard as established under Illinois law, there is no lease cost mandate. And we know that that is likely to by legislative design. There is no lease cost mandate under Article 9, the rate making article under the Public Utilities Act. There is a lease cost mandate in other provisions of the Public Utilities Act, for instance, Article 8 under certificates for how they get investment projects. But here the commission said there's no lease cost mandate, but then the only record evidence showing imprudence was that they didn't choose the least, the cheapest contractor. So they're saying the right words, but then when there's no other record evidence to justify a finding of imprudence other than they didn't choose the cheapest contractor, that again, seems to be at odds with the standard of prudence that this court has developed. And then Justice Walker, if I might make one more point to your previous question, there is a grave factual error in the commission's order. The meter disallowance, Your Honor, we have unrebutted evidence showing that the disallowance overstated and inflated over three million dollars. There were two accounting errors. We brought them to light during one before the proceeding had even started, and it wasn't necessarily an error. It was a, I think, a misinterpretation of that data on behalf of staff. We brought that to light. Let's say we agree with you on that issue. Why isn't that right remedy would be the limited remand for recalculation? Your Honor, we would accept a remand versus being penalized for an incorrect disallowance. You're not asking for a reversal, you're asking for a remand for recalculation. Yes, Your Honor, we would be grateful for that opportunity. So as to that point, there was an argument that you had said repeatedly that those meter costs didn't include the mark and bar. And then you came back and said there was an error with the mark and that was the disconnect. I think that the ICC acknowledged that in the decision, but they said all along you said that that wasn't applicable. So isn't that really the reason why that got miscalculated? No, Your Honor, we would not say that. So mark and bar actually was only established in 2016. And so there were employees at the company, you know, when they were tracking their labor costs, I think that there was a bit of a transition period into how those hours should be allocated. But that larger issue was identified before this case even started. And the company put forth data evidence showing that that was something that they adjusted after 2016. But again, we have this very large gap of time between when the decisions investments were made in 2016. And then when the commission actually heard the case almost eight years later. And we established that we fixed those misallocated hours and put the labor hours in the correct buckets. But staff and staff's expert continue to rely on the prior allocation, and they disregarded it. But Justice Gamer's question goes to the fact that the ICC could find that a legitimate doubt of the accuracy of what you're doing, because in one hand, you say one thing, and later on, you say another thing. And they have an opportunity then to look at credibility and weigh it. And they can decide that issue. And who are we to disagree? Well, I think you have the record before you. And I think it establishes that it's unrefuted that there is a miscalculation. And staff... Well, then why did you say beforehand? I mean, you waited a long time and you contradicted yourselves. Again, that sometimes, is that believable? In different situations, courts go different ways than that. And a commission could go different ways than that. And they love the facts and they made a decision. And under the standard, is that something that's reversible? I think yes, Your Honor. I think that the decision to the commission must be rooted in substantial evidence. And if the evidence shows that there was an error the company brought to light, and that staff and the commission... But again, it goes to the credibility of the error in that you were before saying something else. But you don't have much time left. I don't want to take all your time on this issue. You've raised a lot of issues and you might've already hit it. But I want to make sure that you have the opportunity to raise any other significant issue that we haven't discussed. I know we've been asking a lot of questions. No, I'm glad you have been. I would say, Your Honor, that we also would like to highlight that not only did the commission engage in hindsight, disregarded unrefuted substantial evidence showing an error, over $3 million error, excuse me. The commission also heightened the prudent standard unannounced. Again, under the statute, it required... The statute encouraged People's Gas to make these investments. And it did so significantly. In 2016 alone, it invested over $185 million into the natural gas system that Chicagoans are benefiting still from today. The company relied on the commission's own interpretation of what prudence means when making those investments. Now, almost a decade later, in a reconciliation proceeding of a sunset statute, the time has run up. The legislature gave a clock on those investments. And People's Gas heeded the encouragement and the incentive to make these safety and critical investments trying to prevent a natural gas pipeline explosion in the city of Chicago. And now to expand the prudent standard after the fact, with no notice, we find to be unlawful, unfair, and against the regulatory certainty that Illinois utilities need to engage in investments in Illinois, specifically safety-related investments that the legislature authorized. Ms. Wieckowski, you're out of time, but go ahead and finish your thought there. But I just want to let you know you're out of time. But go ahead. Oh, no, that was it. That was it. Thank you. All right. Thank you. And you did say five minutes for rebuttal. Thank you. Okay. All right. And I'm not sure who's going first, but... Mr. That'd be me, Your Honor. May it please the court, counsel. Good afternoon, Your Honors. My name is Brian Dodds, appearing on behalf of the Illinois Commerce Commission. Counsel, as I mentioned before, counsel for the Attorney General's Office, Anna Gottlieb, will be representing the AG. And we're going to split time half, 10 minutes, 10 minutes. With my 10 minutes, I'd like to address the substantial evidence supporting the commission's disallowances and their correct application of the prudence standard, specific to some of the issues predicated on staff witness testimony. Ms. Gottlieb will address the categories, specifically the change order disallowances that are based on the Attorney General's testimony. And of course, should Your Honors have any questions for us, we're happy to answer them as best we can. Before... There's a lot of material covered in Ms. Wieckowski's presentation. I want to be sure to get to it and address Your Honor's question. But I want to step back very briefly and note that, as counsel said, this is a reconciliation proceeding under Section 9220.3 that allows for recovery on a surcharge tariff of qualified infrastructure plant investments for a calendar year, here 2016. The utility came in and sought $184 million, which is consistent with past practice. They have recovered hundreds of millions of dollars over the decade-long span, or rather, the statute allowed for a decade-long span, 2014 to 2023. The later cases are still being litigated, but have availed themselves of this procedure to recover hundreds of millions of dollars. The standard underlying all of it is prudence. And I'll just reiterate the standard because I don't want to deviate too far from it here. It hasn't changed. It didn't change in this order. Prudence is what a reasonable person would exercise under the same circumstances as confronted by utility management, given the information available. I'm going to jump in a minute since that's where you are. But you do agree that there were some situations where the commission found that they were not being prudent because they simply went with the highest bidder. And do you think that that necessarily means that they're not prudent? Because it seems like there was nothing else in the record that would have supported that position that the commission took. I want to clarify two premises in your Honor's question. The short answer to that is no. But the premise there is that, number one, we established some sort of least cost requirement, which is not true. In fact, we explicitly disclaimed that in order, and we've mentioned that in our brief. Second, the problems with the contractor selection, contrary to counsel's representations, is not just that they weren't the least cost. The 2016 bid letting 38 was $38,000 over the next lease cost. Bid letting one from 2014 was $950,000 over. That's where we get the $1.05 million for contractor selections. Here, what we have in that bid letting 38, the only explanation we got from the utility was that there was a management shakeup that caused a spike relative to the next highest bidder. We had competing testimony interrogating that in the record, and this is at, I think we cited in brief. I don't know if I have it handy. There was competing testimony from Mr. Antonin for Liberty and staff, as well as AG witnesses contesting why a management shakeup would amount to that. You had a battle of the experts. The commission ultimately credited staff's explanation. That was for the $93,000. For the $950,000 change order, that was 2014 bid letting number one. There, the spike was a million dollars over the next highest bidder, or the next lowest bidder. They went with the second highest bidder, essentially, who was a million dollars over their next peer with essentially no explanation. I think this all gets to actually back to the prudent standard in a way that I think is important to clarify here. It touches on several of Your Honor's questions. Council referenced a case, the Commonwealth Edison case from 2016. That is, as Justice Hyman pointed out, an ICC decision. There is no appellate authority for the proposition that there is a range of reasonableness standard to the prudency. The utilities have tried to inject that into Illinois case law in the appellate courts numerous times over the decades. The appellate courts have not bid on it. As Your Honor pointed out, there are two recent appellate cases affirming the commission on a prudence review. I just want to clarify Council's representation. The NICOR decision from last year was a QIP decision, not a rate case decision. I'll just give you the docket number because I have it right here. It's the NICOR 2015. We're familiar with it. Sorry, yes. It's the unpublished decision from 2024. Even though, whether it's a QIP decision or a rate, a tariff is a rate, correct? That's correct, yes. So the prudence standard doesn't change, does it? It doesn't change with one important caveat. The prudence standard, so prudence is what a reasonable person would do under the same or similar, excuse me, the same conditions confronted by utility management at the time the decision had to be made, and that's important, and I'll come back to it. The decision had to be made. The QIP and reconciliation proceedings have a caveat frequently in their case law. Hindsight review is impermissible. The reason they do that, and Ms. Riccozzi highlighted this, we're talking about money that was already spent for things that are already put in the ground, and they're trying to recover it. That compared to a rate case, that is a future test year budget meeting. It is a budget meeting, essentially an assessment investigation under 9201 about what would be prudent utility decision making. Reconciliation cases, including QIP, have that additional caveat. Hindsight is impermissible. What that doesn't say, and this gets to the program construction management portion, what that doesn't entail is you, the commission, are prohibited from quantifying imprudence that we know occurred in 2015 and 2016, and that's the real issue with that 7.82 million here, okay? So just to clarify here, we're talking about, when we talk about these programs, we're talking about what used to be called the Accelerated Main Replacement Program, now it's called System Modernization Program. This is frankly a benighted program. I think the commission in its order said it had a long and troubled past. That's an understatement. It is perennially over budget, perennially behind schedule in their underground main replacement, such that the commission directed the hiring of Liberty as an independent auditor to hold the utility's hand along this process. It did that, and in May of 2015, and this is in the record, I believe the 2015 citations are at E, just so you have it, E2069, Exhibit Volume 5. In 2015, Liberty drew and insisted that the program construction management cannot continue under this approach and remain prudent. That was in May of 2015. It then drew up a list of 95 recommendations, 81 of which were ultimately implemented by July of 2017. So the utility... And they said nice things about the implementation. They did, absolutely. Don't get me wrong. The changeover from Integris to WEX saw a true change. Liberty credited them with implementing a lot. The problem is with respect to program construction management, they slow walked it. They had 95 recommendations detailed at the point when they bought the company. The question is when WEX buys the company, does it buy the bad management structure that was already there? The commission said yes. People says no, rate payers should pay for that. That's essentially the program construction management fight. When they bought this, they were, and this is a quote from testimony, creating a management system from scratch. That phrase came out in Discovery and people's conceded it. They were creating it from scratch. The question is, should it have existed before? Yes. Unrefuted testimony, yes, it should have existed before. And they put it into effect by July of 2017. So who pays for the avoidable costs arising out of that imprudence that came in 2015 to 2016? We think rate payers and there's substantial evidence to support it. The notion that trying to, I think Justice Hyman, you hit on it precisely, the difference between, and we get into this in our order in 54, page 54, there's a difference between a determination, when the decision had to be made, was it prudent? That's why I emphasize when the decision was made, was it prudent? And how much did it cost? The commission noted at page 54 in that order, that there were actually two instances of imprudence here. Number one was slow walking the implementation. Number two was not documenting it sufficiently so that we could know what the avoidable costs were. With that quandary, we were forced to look at, okay, you ultimately put this stuff into effect. You saw your program construction management costs drop down by 7.82 million. That's our avoidable costs. Let's look at what you knew in 2015. Looking at this 95 recommendations, how quickly did you implement them? We don't know. Who pays for that imprudence? We ultimately found that it was the shareholders who should pay for it, not the rate payers, and there's substantial evidence to support that. I want to touch on a couple of things that came up. So we've addressed the contractor selection and why this battle of the experts issue arose. I want to address the meters issue. Mr. Dodds, I'm going to allow you to address that issue, but you're actually out of time, but you can take a minute. Let me direct you. Let me just ask you, am I correct that with bid letting 38, the non-bidder who was awarded the contract, those costs were, in fact, right in line with the middle bid. Am I right on that? I believe that is correct. You're talking about the 93? Yes. Yes. The 93,000. So it was in line with the middle bid. And with the million dollar overage, there was a rather big limited testimony to CGL about why they picked that bidder. But under no uncertain terms, ICC is not imposing a least cost directive. Correct? No, absolutely not. And in fact, there were challenged bid lettings that the commission ultimately rejected. There were AG proposed and staff proposed bid lettings that they wanted to exclude. I think bid letting 50 was a good example of that. We got into that in more detail in our order, where they challenged it. And the commission ultimately said, you know, in the competing burdens of production, you came back with a good explanation for why you went with the non-least cost bid. That's going to be approved. We're going to put that under rights. The instances here where you have a non-least cost bid, there were actual, the utility failed to prove by a preponderance of the evidence that this was prudence. And that's their burden under the Administrative Procedure Act. Let me ask you about, oh, what? That million dollars wasn't the real question, whether that million dollars was necessary or whether it was avoidable. And the commission didn't address that. It never determined whether it was avoidable or whether it was necessary. So as I read it, I'm thinking, let's say that PTL proved that these were costs that were going to be inevitable anyways. Don't we have to give something towards that? Something towards that in the sense of? Like this million dollar difference. Excuse me. I'm sorry. I'm thinking of another point. The 133. What is that 133? We're going to save that for Mr. Scott. The 133,000 disallowance was one of the AG change order disallowances. But that million dollars, that was a million dollars over the lowest bidder. Over the lowest bid without an explanation sufficient to explain that spike. Yes. So why does ICC measure it against lowest bid versus the second lowest bid or the third lowest bid? Your Honor, I'm not sure that I have a reason for you why they would. I think that was just a way to quantify the scope of how far off they were from this relative floor. So they're trying to describe just how much over. I mean that $93,000 over on this particular project bid was a lot of money. But I think relative to the project, if I'm remembering my math correctly, wasn't so significant a spike there. It was a dispute over whether a management change affected it. Here we got a million dollar overage with essentially no sufficient explanation. Like no is in radio silence in the discovery. So that goes to my question. What happened was all or nothing. Yes. They got nothing. I think that's right. I think that's right. So the question is would, why should we not remand it to see whether any part of that should be allowable as a project continuation that was prudent? That gets into a problem of frankly judicial economy. Section 9201C places the onus on the utility to prove its case by a preponderance of the evidence under the Administrative Procedure Act. Preponderance of the evidence on each of these issues. You have to come forward with a case. Interveners then come in and challenge. We saw and interveners challenged it in the record testimony from Mr. Antonuck and I believe Mr. Coppola for the Attorney General's Office commented on this million dollar spike and testified it would not be prudent for you to award this bid without some type of explanation and we didn't get one. So that gets to every time that happens does the utility get to appeal it and then get a remand for a second crack. So it was a lack of evidence and therefore. It's an insufficiency of the evidence. They didn't prove their case and so they get a second chance at it. Okay got it. If I could just very very briefly the meter point. That'll be your last point. Make it quick. I was allowed. I appreciate it. Justice Gameth was still asking you questions. Wait I have to say Justice Walker the meter is running. It is. On that note. I'll be very quick about this. So the the problem there was we got different explanations. I think Justice Hyman you touched on this. We got different explanations in the course of proceeding about Mark and Barr in 2016. It was implemented in 2016. Was it factored into their meter costs that they were trying to recover through QIP? Initially they said no. Then they said yes. Ultimately we were looking at a per meter spike from $433 to almost $1,000 I think $900. If the Mark and Barr was included there's no showing that that was a prudent procedure. That was the underlying factual problem there. If it was excluded then it's apples to apples and we have no explanation for why labor costs doubled. So if you include it or exclude it the problem is it's not prudent but they gave us shifting answers throughout the case. And we think for that reason and the reasons articulated in our brief we ask you to affirm. Didn't they say they had to do with extraordinary travel time? You know places were far away. And there was nothing about that. Well they raised a vague attestation of meter density and travel times to the Beverly neighborhood which was I gather was further than what their crews were normally based out of. That was as specific as it got. Ultimately the commission looking at doubling of labor costs said that. Thank you Mr. Dotz. Thank you Ms. Gottlieb. Good afternoon. May it please the court. I am Assistant Attorney General Anna Gottlieb and I represent the people of the state of Illinois. As previewed by Mr. Dotz for the commission I plan on addressing the commission's findings related to the disallowed costs based on the Attorney General's objections. Though I'm happy to address any of this court's concerns. Can you start with 133 and answer my question. The commission never determined whether those costs at all were going to be inevitable or whether they were unnecessary or could have been avoidable. Your Honor two points about that which is a reference to the Attorney General's objection to cost relating to bidding. This is in reference to the Portage Park project and the commission actually made two findings here. One was that these two change orders that People's Gas actually did not provide evidence as to what they were which is why they were flagged by the expert in the first place. It appeared that the first change order dealt with damage that may have been caused by the People's Gas crew themselves and the other one was unspecified damage and when asked for additional information that they did not provide that information. So for that reason that is you know sufficient for this court to affirm disallowing that cost based on a substantial evidence review because we truly did not know the basis for these change orders. And then separately the commission also noted that they did not engage in a bidding process but instead went into a materials-based you know labor and materials-based calculation which is more expensive but really the main issue with this $133,000 is the fact that they were that People's Gas did not provide sufficient evidence as to why these change orders were required in the first place. So think at zero reimbursement for that. That's correct your honor. Because what if they had bidded out and the bids came back comparable? Would the commission have still denied it? It couldn't have used that time of materials as a basis. I think we don't really need to reach that question here because of the factual circumstances of these change orders because we don't really know why they were they existed in the first place. And if you know if the only evidence with respect to one of these change orders is that the damage was caused by People's Gas crew in the first place it's that is not a necessary or prudent cost to begin with. So for that reason I don't think a remand is appropriate for that. I read the ICC decision to be that it was really just based on that time and materials and that the ICC didn't get to the question that you had raised of saying this was PJL's fault and so it's not reimbursed. But I'll go back and look at that. And so to the extent it was only based on the time and materials determination we still don't think that that is appropriate here because of. And you're giving them nothing even if they had to do the work. You're still the baseline now is zero. It's not that low bid it's zero, correct? So based on the expert testimony here of the Attorney General, Mr. Coppola, you know my determination why these change orders were of the 20 flagged out of the 400. But for the specific time and materials piece I don't believe that People's Gas provided a reason why they went that route and that was another reason with why this cost was disallowed. So it was really that, just Sam are you about to jump in? So it was really that there was no evidence suggesting that it was the most cost-effective or efficient approach to completing the restoration. Is that kind of where it goes? I think that I think this will be a question that I'll be asking Ms. Rakoski in a second. You know I would have to consult the record based on that specific finding but my understanding is there was this threshold issue of whether this work had to be done in the first place. I don't think it was based on just the least cost-effective piece of it. Are you saying that there's a requirement of least cost-effective? No we're not saying that your honor. We're not saying that. You did just imply that though maybe you didn't mean it. I did not mean to imply that. I do believe that there was a two-prong issue with these particular change orders. So before getting to the route that they went, I think there's an issue of whether these change orders were required in the first place. And just to step back for a second with the entirety of the Attorney General's objections, I would like to note just that. Just backing up for a second because it seems like that if it's if it is the issue that it wasn't the most cost-effective or the most efficient approach that okay they may not be entitled to the 133. I think it was 133, 133 or something like that. They may not be entitled to that but they're probably at least entitled to half of that. Just along that continuum. Yeah so just looking back in the commission's decision with regard to this which is on page 55, the commission notes that without more information it has not been shown that this is a prudent decision. So they simply did not meet their burden with respect to this being a prudent decision. They had the opportunity to do so. They had the opportunity to do this on reply and as Mr. Dodds had noted in terms of just judicial efficiency and economy, these proceedings there was a lot of evidence submitted and this issue had been raised in front of the commission so they had the opportunity. Just so we're clear, we're talking about the Portage Park restoration right? That's correct your honor. Yes so they had the opportunity to present evidence as to why this decision was the most that was was prudent at the time it was made and they did not meet that burden. And just again stepping back to just our forfeiture point which is that people's guests in their initial brief did not make any specific arguments with respect to half of the attorney general's objections and outside of their statement of fact which under Illinois Supreme Court Rule 341 H6 cannot include arguments. The only place in the initial brief where arguments with respect to particular projects were made was on pages 51 and 52 of their brief and those do not make any arguments with respect to why there isn't substantial evidence to support those findings and that would make it really impossible for this court to reverse or remain based on those particular projects. Setting forfeiture aside though each of the disallowances based on objections by the attorney general which again are just two percent of the total amount that people's guests sought to reconcile in this proceeding was supported by substantial evidence. Let me ask you the 2.4 that you're talking about these specific projects how do we know that that's not already encompassed in the 7.8 million? Sure your honor so contrary to the content contentions of people's guests here the 7.84 million dollars flagged by liberty as part of project management was those were overhead management costs and if specifically on page 1673 which is the liberty report that actually outlines line by line what is included and not included in this particular calculation and there they list distinct costs so management project costs were a distinct category those were different than money that was paid out to and everything the attorney general objected to based on its expert was related to costs age orders which by definition would have been paid out to contractor crews so there is no overlap between these two pools of money and this is actually further evidenced by the fact that there was one category of disallowances that the commission staff had initially um put forth and the attorney general did not support them because those did look at change orders and those could have had some overlap but for as the commission found there these two disallowances were based on completely different pools of money and people's gas has not come forward with any evidence showing that that is actually not the case. Okay Ms. Cutler if you have about a minute left I'll let you continue on. I know that Mr. Dodds went over but he went over because the other two justices were still asking him questions so I don't cut off the justices but you've got about a minute left. Absolutely thank you your honor um so specific to the disallowances by the attorney general they were supported by substantial evidence um the record shows that with respect to each of these categories of projects people's gas failed to do its due diligence which resulted in additional costs through change orders. I'm happy to provide some examples but because I'm running low on time if there are any questions this court has about particular projects I'm happy to answer them otherwise um we'll rest on our briefs. Thank you. Thank you Ms. Cutley uh and Ms. Roccozzi you are up. Roccozzi I'm sorry. That's okay your honor um thank you I would like to first start in response to one of your questions there is an appellate court case it is Illinois Power Company versus ICC it is a fifth district uh opinion and it decided to on page 34 of our initial brief and it is it states quote reasonable persons can have honest differences of opinion without one or the other necessarily being imprudent so in response to your question there is um appellate case law that supports our position that to be imprudent you need not to be prudent at all um to the second point I would like to make um I think um one of the counsels uh stated that your review is subject to section 9-201 of the PUA um again that is the general rate making uh provision and that is not um that is not governing your review under this case in New York uh this court has held that and which was the ICC's position in our lower case that you reviewed um your interpretation was that this is separate it's due to the legislative mandate for these types of investments to be made um third I would like to also just remind the court that the counsels keeps uh attempting to create a exception to the hindsight rule again by stating that because they don't like how the company accounted for costs or didn't didn't account for costs in certain regards then that equates to a level of imprudence using years after the fact again there is no exception to the hindsight rule and the ICC itself inconsistently applied hindsight is that hindsight or is that the lack of evidence well I think using information not known to the company at the time of decision made in 2016 is then you didn't have the evidence and I mean either way it seems that the decision could be upheld well I think a great response to your question is the ICC itself found hindsight do the exact same thing when it disallowed staffs disallowance because staff used performance in 2017 and 18 the costs of permits in those years and the ICC said that that was hindsight but the exact same methodology for program and construction management costs without identifying a single act of imprudence they then said that's okay the ALJ's order found both hindsight two long-standing administrative law judges of the commission said that's hindsight it doesn't get more basic hindsight than using information that wasn't known to the companies and penalizing them after and the reason there is a rule is because they would prevent utilities from making any incremental enhancements over time and that is the purpose of why you aren't allowed to use hindsight and exactly what the commission did here I would like yes point I mean what's pervasive throughout is that pgl was supposed to things before and they waited and somebody used the term slow walked and again you had all this consulting with liberty they came in they reviewed you quarterly you know they they ultimately found like this should have been done and the fact that you guys did a good job in 2016 trying to work to get these things done that should have been done before who pays for that it's like a contractor going overtime contractor bids out and says it's going to be 40 hours well they're taking their time they're being slow and all of a sudden they want to bill you 20 extra hours on overtime who has to pay for that in this case I understand your company's position saying we have invested millions for this benefit you invested millions so you could keep supplying and you get reimbursed on the backs of consumers who pay the tariffs which are higher rates so here I keep hearing from you about how you have proved your case because you have given what you think is enough but the ICC in their expertise didn't find it to be enough the explanations that you gave in some instances were not good enough and so I'm having trouble finding how that is a shifting of the burden versus ICC saying you know these costs are astronomical and you haven't quantified them for us and so we're going to we're going to do it by looking back at 2017 and 2018 and showing this differential here in terms of quantifying it we've already found it to be imprudent but to give you a disallowance we want to be fair and in a measurement and since you didn't delineate them we're doing it for you otherwise you'll get the whole thing well I would push back on one point you just made your honor the staff did not identify any specific imprudent act it purely looked it did a straight in the commission itself quotes they did a straight line comparison from 2016 costs of 2017 and 2018 and they took the difference and that was its disallowance that doesn't that's not any record evidence from besides a liberty consulting who also's general finding was that the company made vast and significant improvements in that function and if it's and if the slow walking is the only yeah but they also found things that should have been done before so pgl is an established company and as they admitted they said we're creating a program for safety management well that's all well and good in the meantime you've been getting millions of dollars in reimbursement you've been you know providing these services this needed to have been done we're not giving this to a startup company we are giving this to pgl and so you coming in and saying we need to invest all this money in creating a program that is where the imprudence came your respectfully your honor those those investments were were expressly authorized by the legislature and they were safety investments they couldn't just have gone and done anything there were specific categories investment that the legislator identified as being important enough to safety in chicago and reliability that they needed to be done and they needed to be done quickly they removed those investments in the general rate case and it gave them its own provision its own reconciliation and its own tariff that the commission had to approve before they made a single investment and then it took those for investment and leaves in a 10-year period and said you do this and you do whatever you do it quickly because we don't want an incident like san bruno to happen in illinois and the legislature did that and then it authorized the icc but with less authority than a section 9-201 rate case and they said you can review the prudence of these costs but they are presumed as you this court once itself said are per se just and reasonable and when council said that there's a the 9-201 standard applies this case actually it doesn't and that is what this court itself has said but then to say that we didn't satisfy our burden your honor you noted that we slow walked and potentially the councils are saying we move too slowly again those are matters of opinion and again that does not prove with record evidence that the company acted that the company's decisions were not prudent at all and they were making improvements as liberty notice but i don't know how that equates then to a 7.82 dollar disallowance again the company thinks that the ag's approach to findings of imprudence was a correct in its approach do we disagree and think that the commission penalized the company for not fulfilling a standard of perfection yes however at least the ag has specific evidence that it thinks that it can point to whereas the staff's disallowances it's it's based on pure cost estimates from later periods and the icc itself said you can't do that when it didn't adopt staff's permitting disallowance and again but then also for the bid letting than this least cost sure the icc can say there is no least cost mandate but the only record evidence supporting of at least one of the two at issue bid lettings is that it wasn't least cost and then if we're going to say well maybe it wasn't the most cost efficient again it doesn't show that the decisions of the company weren't printed out at all and that's i think the whole the crux of the case and the disagreements and this isn't a battle of experts this is a battle of an asymmetrical standard people's gas meets its burden as the legislator intended it it makes the safety investments and it does so quickly and it thought that it's just it's thought it thought that those investment decisions would be then judged by prudence very well established prudent standard that the icc itself has said limits its discretion but then 10 years later mr mcclosey you're way beyond your time yeah but so i'll let you finish your thought and but i actually wanted to come back to the question of the portage park restoration i said i would come back and ask you about that that was the 133 133 that was disallowed the commission took the that pdl produced no evidence whatsoever suggesting that the decision to pay the contractors based upon time and materials was the most cost effective and the most efficient approach to completing the restoration did you want to respond to that yes thank you your honor there again there's no most efficient or least cost or any of these types of qualifiers in the statute in the case law the abundance of case law established over a century in the state making any of those findings necessary for the court to find prudence and to then after the fact 10 years later say because it wasn't the most cost effective or it wasn't least cost or any other number of reasons is it also violates the company's due process they never come the commission has elevated prudence into perfection and it never gave the company an opportunity to meet that standard but but isn't that where you come in on a reply and say this is why we chose time and materials this is why and i didn't read that explanation in the record um and then following up on that council had said that the commission actually said you guys didn't explain what those two change orders were for um liberty or somebody thought that one was caused by pgl and the other one there was no explanation did the commission rule on that point um your honor i would need to refer we'll go back and look but but as to that did live did you ever come back and explain why time and materials was prudent i believe we did your honor and i'm and i i'm recalling but i please correct me if i'm wrong but again liberty may be finding a particular with respect to the company's um contractor selection documentation and processes noting that they were both good and in this specific instance there was a reason the company did a time materials and it is definitely in in the record but again the comp the commission decided that the justification that the company gave wasn't good enough based upon the interveners who again never established that it was not prudent at all like comparing them to other things or other costs or other contractors that doesn't show that people's gas's choice was imprudent it might show that there might have been another reasonable option but again two reasonable options don't equate to imprudence thank you miss for cozy and then death thank you miss gottlieb and mr dobbs we appreciate your excellence you all did an excellent job in arguing an excellent job answering our questions and i assume the justices do you have any more justices justices have no more questions so we will conclude these are arguments and again we thank you for your excellence thank you thank you your honors take care